**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| United States of America, ) | CR-08-1377-PHX-JAT |
| Plaintiff, ) |  |
| v. ) | **ORDER** |
| Melvin Nash; Mason Henry, ) |  |
| Defendants. ) |  |

Pending before the Court is Defendant Nash's motion to suppress his statements on the grounds that, considering the totality of the circumstances, his statements were involuntary.

**I.     Background**

In this case, the two co-defendants are charged with multiple crimes including the murder of Aaron Tierno, brandishing and discharging a firearm in relation to a crime of violence, felony murder as part of a robbery, and conspiracy to commit murder. Doc. #1. Both defendants have pled not guilty.

More specifically, Defendant Nash became aware that Tribal Officers were looking for him related to allegations of stolen property and fraud.[1] On September 9, 2008, Mr. Nash turned himself in at the San Carlos Police Department and was taken into custody by Tribal

---

[1] The stolen property and fraud related to Mr. Nash's possession and attempted use of Mr. Tierno's credit cards.

1 | Officers related to the stolen property and fraud issues. Thereafter, two BIA agents
2 | interviewed Mr. Nash beginning at 12:35 p.m.

At the beginning of the interview, the Agents read Mr. Nash his *Miranda* rights and asked him if he understood them. Mr. Nash said he understood and then signed a form waiving those rights. Mr. Nash also advised the Agents that English is his primary language. Agent Moran testified and Agent Bilagody agreed that Mr. Nash seemed clear and coherent and in good physical condition. Agent Moran further testified that Mr. Nash advised them that he had his G.E.D. and considered himself to be very intelligent.

The Agents advised Mr. Nash that they were investigating the disappearance of Aaron Tierno. The Agents told Mr. Nash that they knew from security cameras that he had been at a McDonalds with Mr. Tierno, and that he had later tried to use Mr. Tierno's credit card at a store. Mr. Nash admitted to the attempted use of the credit card.

During the interview with the Agents, Mr. Nash requested and was permitted to call his mother.[2] Mr. Nash requested and was denied being driven to his parents' house. Mr. Nash attempted to leave and was denied that request.[3] Mr. Nash was then told if he would tell the Agents where Mr. Tierno's body was located, the Agents would attempt to make arrangements for Mr. Nash to go to his parents' house.

Eight minutes thereafter, at approximately 1:48 p.m., the Agents and Mr. Nash got into a vehicle and Agent Moran drove Mr. Nash around while Mr. Nash used hand signals to show the Agents where to go to find Mr. Tierno's body.[4] Once the body was discovered in a remote location, Mr. Nash said to Agent Bilagody, "every mother should be able to bury their son and that's the only reason I took you here." Agent Bilagody testified that this

---

[2] During this call, Mr. Nash spoke to a person that the Agents believe was his mother; but they could hear only Mr. Nash's side of the conversation.

[3] Specifically, Mr. Nash said, "You have nothing on me, and I am going to leave," and the Agents told him to sit down.

[4] Agent Bilagody rode in the backseat of the car during this drive.

statement was sua sponte volunteered by Mr. Nash while they sat in the car at the location of Mr. Tierno's body, and she did not address him in any way that might have prompted or solicited this statement.

Thereafter, Mr. Nash and Agent Bilagody returned to the BIA offices. Agent Bilagody attempted to continue the interview, but Mr. Nash requested an attorney; so, the Agent ended the interview. Later, the Agents contacted Defendant Nash's family, who came to the BIA offices and visited him.

**II. Discussion**

In this case, Defendant Nash does not dispute that he was read and understood his *Miranda* warnings.[5] However, he argues the his post-*Miranda* statements are still involuntary because the Agents did not terminate the interview upon his request, and because the Agents overbore his will with a promise to go see his mother if he confessed. Doc. #39 at 8. Defendant Nash further argues that, after he requested that the interview be terminated, he was not re-issued *Miranda* warnings. *Id.*

A suspect can waive his *Miranda* rights and allow questioning, provided that the waiver is voluntary, knowing, and intelligent. *United States v. Bautista-Avila*, 6 F.3d 1360, 1365 (9th Cir. 1993). Even after a *Miranda* waiver, the Government must establish the voluntariness of a confession by a preponderance of the evidence. *United States v. Heredia-Fernandez*, 756 F.2d 1412, 1415 (9th Cir. 1985). A "confession is involuntary only if the police use coercive means to undermine the suspect's ability to exercise his free will." *Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir.), *cert. denied* 123 S.Ct. 449 (2002). Impermissible coercive activity can include lengthy questioning, deprivation of food or sleep, or physical threats of harm. *Colorado v. Connelly*, 479 U.S. 157, 163 n.1 (1986) (listing examples). When a suspect alleges psychological coercion, the relevant question is whether the suspect's will was overborne when he confessed. *United States v. Miller*, 984 F.2d 1028,

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

1031 (9th Cir. 1993).

No one factor is dispositive of whether a confession was voluntary; therefore, all factors must be considered under the totality of the circumstances. 18 U.S.C. § 3501(b). The factors are:

1. the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest but before arraignment;
2. whether such defendant knew of the nature of the offense with which he was charged or of which he was suspected at the time of making the confession,
3. whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him,
4. whether or not such defendant had been advised prior to questioning of his right to assistance of counsel, and
5. whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

*Id.*

Additionally, the Court may also consider the defendant's personal history, level of education, physical condition, and mental health. *Taylor v. Maddox*, 366 F.3d 992, 1015 (9th Cir. 2004).[6] Notably,

> giving the [*Miranda*] warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver. *See Berkemer v. McCarty*, 468 U.S. 420, 433, n. 20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare").

*Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004).

Applying the factors, the first four weigh in favor of finding all of the statements to be voluntary. First, from the beginning of the interview, through the car ride, to the conclusion of the interview back at the office was about three and one-half hours. Thus, this is not an excessive length of time regardless of the time of the arraignment. Second, Defendant Nash knew from the Agents' statements that they were investigating the

---

[6] However, a defendant's "personal characteristics . . . are constitutionally irrelevant absent proof of [police] coercion." *Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir. 1990) (internal citation and quotation omitted).

1  disappearance of Mr. Tierno. With respect to the third and fourth inquiries, Defendant Nash
2  had been advised of all of his *Miranda* rights including the right to not make statements, the
3  fact that the statements could be used against him and of his right to counsel. The fifth factor
4  weighs against finding the statements voluntary in that Defendant did not have an attorney
5  during questioning.

6  Considering the totality of the circumstances, the Court's initial analysis shows that
7  the statements were voluntary. The Court will now turn to Defendant's specific arguments
8  regarding why the statements were nonetheless involuntary.

### A. Promises

A statement is involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897). This broadly-stated rule has not been applied to invalidate, per se, all statements made by a suspect in response to a promise made by law enforcement personnel. The promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances.[1] *See Hutto v. Ross*, 429 U.S. at 30, *Miller v. Fenton*, 796 F.2d 598, 608 (3d Cir.), cert. denied, 479 U.S. 989 (1986).

> [1] Causation, including but-for causation, has never been the test for voluntariness. *Hutto v. Ross*, 429 U.S. at 30, 97 S.Ct. at 203. If the test was whether a statement would have been made but for the law enforcement conduct, virtually no statement would be deemed voluntary because few people give incriminating statements in the absence of some kind of official action. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 224-25 (1973).

*U.S. v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988).

Defendant argues that Agent Moran "promised" to take him to his parents house and that this overbore his will.[7] Agent Moran testified that he told Defendant that he would "attempt" to arrange for Defendant to go to his parents house if Defendant gave a statement about what happened and where Mr. Tierno's body was located. Agent Moran went on to testify that he told Defendant Nash that if he made a further statement they would "work it out" with respect to Defendant Nash seeing his mother. Finally, Agent Moran testified that

---

[7] Agent Bilagody had left the room during this portion of the questioning.

he and Defendant Nash had an "agreement" that if Defendant Nash gave a further statement, Agent Moran would do whatever was in his power to facilitate an in person meeting between Defendant Nash and his mother.

At the hearing, after the conclusion of Agent Moran's testimony, the Government conceded that this "agreement" — that in exchange for a statement, Agent Moran would "work out" Defendant Nash being allowed to see his mother — was tantamount to a promise. As quoted above, the fact that a promise occurred does not end the inquiry of whether any statements made after the promise are involuntary. Thus, the Court must now consider whether, under these specific circumstances, was the agreement/promise so compelling that it would overcome Defendant Nash's will.[8]

Prior to the agreement, Defendant Nash requested and was permitted to call his mother's house and speak to her. During the "promise/agreement" conversation, the Agent told Defendant Nash that if he took him to the body and gave a statement, he would "attempt" to take Mr. Nash to his mother's house, and that he would "work it out" and so that Mr. Nash could see his mother. Agent Moran testified that he never promised that Mr. Nash would see his mother because he could not guarantee that result.

While the Court agrees with the parties that this "agreement" is tantamount to a promise, the promise was not much of an enticement. In essence, Agent Moran agreed to merely try to help Mr. Nash see his mother if Mr. Nash made a further statement. Additionally, questioning had been on-going only a little over one hour and during this time Mr. Nash had been allowed to speak to his mother. Mr. Nash had been advised of his rights, and understood them well enough that he eventually invoked his right to counsel. Given these circumstances, the Court disagrees with the defense that Agent Moran's agreement to

---

[8] Specifically, Defendant Nash seeks to suppress two "statements" following the promise. First, he seeks to suppress his hand gestures which lead the Agents to the location of Mr. Tierno's body. Second, he seeks to suppress his statement to Agent Bilagody at the location where the body was found in which Mr. Nash said, "every mother should be able to bury their son and that's the only reason I took you here."

try to help Defendant Nash see his mother was so compelling that it would overbear Defendant Nash's will. Further, Mr. Nash later stated that he lead the Agents to the body to permit Mr. Tierno's mother to bury her son, not because of any express or implied promise that Mr. Nash would be permitted to see his mother. Thus, considering the circumstances surrounding the "promise" in this case, the Court finds that this particular promise was not so compelling that it would overbear Mr. Nash's will. Therefore, the Court will not suppress the statements as involuntary based on the agreement Agent Moran made with Defendant Nash.

### B. Request to terminate the interview

> A defendant who is in custody must be given Miranda warnings before police officers may interrogate him. *Disla*, 805 F.2d at 1347. Once such warnings are given and the defendant invokes his right to remain silent, the admissibility of statements obtained thereafter depends upon whether the defendant's right to cut off questioning was "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).

*U.S. v. Moreno-Flores*, 33 F.3d 1164, 1168-69 (9th Cir. 1994). However, if a Defendant's invocation of his rights is ambiguous or equivocal, questioning may continue. *Davis v. United States*, 512 U.S. 452, 462 (1994).

As discussed above, it is undisputed that Defendant Nash was adequately advised of his *Miranda* warnings. The question is whether, prior to the car ride, when Defendant Nash said, "You have nothing on me, and I am going to leave," and the Agents told him he had to sit down, were the Agent required to end the interview.

The Court does not find the statement "I am going to leave" to be a clear and unequivocal invocation of the right to remain silent or the right to counsel. Therefore, under *Davis*, the Agents were not required to conclude the questioning. Additionally, the Court does not find that the Agents had any duty to *re-Mirandise* Defendant. Thus, the Court does not find that the statements must be suppressed on this basis.

Accordingly, again considering the totality of the circumstances including Defendant Nash's specific arguments regarding why his statements were not voluntary, the Court still

finds the statement were voluntary.  As a result,

**IT IS ORDERED** that the motion to suppress statements (Doc. #39) is denied.

DATED this 28th day of July, 2009.

James A. Teilborg
United States District Judge

- 8 -